Robert W. Sadowski
SADOWSKI KATZ LLP
800 Third Ave, 28th Floor
New York, New York 10022
Tel. No.: (646) 503-5341

*Attorneys for Dr. Dan Giurca*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. DAN GIURCA,<br><br>    Plaintiff,<br><br>    - against -<br><br>MONTEFIORE HEALTH SYSTEM,<br>INC., JEFFREY WEISS, M.D.,<br>CLAUS VON SCHORN, M.D., and<br>GARY ISHKANIAN, M.D.,<br><br>    Defendants. | Civ. No.: 1:18-CV-11505 (DAB)<br><br>**AMENDED COMPLAINT** |

Dr. Dan Giurca ("Dr. Giurca") by and through his attorneys, Sadowski Katz LLP, alleges for his amended complaint as follows:

**PRELIMINARY STATEMENT AND NATURE OF THE ACTION**

1.      This is a civil action brought by Dr. Giurca against the Defendants Montefiore Health System ("Montefiore"), Dr. Jeffrey Weiss, Dr. Claus von Schorn, and Dr. Gary Ishkanian, (collectively "Defendants") under the retaliation provisions of the Federal False Claims Act, 31 U.S.C. § 3729(h), and the New York State False Claims Act N.Y. Fin. L.§ 191, N.Y. Labor Law § 741, and defamation, tortious interference with contract/prospective business relations, and other state law claims to recover damages sustained by Dr. Giurca.  Defendants retaliated against Dr. Giurca for his bringing to light and attempting to correct Defendants' violations of the Federal and State False Claims Acts, which resulted in patient harm and abuse and defrauded the

Medicaid and Medicare Programs. Plaintiff witnessed and reported to Defendants the neglect of patients—leaving them unattended for 14 hours, upcoding claims for reimbursement, and malpractice.

2.     This action also seeks to recover damages suffered by Dr. Giurca caused by Defendants' unlawful retaliation in violation of 31 U.S.C. § 3730(h) and N.Y. Fin. Law 191, and N.Y. Labor Law § 741, and injunctive relief to cause Defendants to cease and desist black-listing Dr. Giurca, which Defendants have refused to do, thus continuing to harm Plaintiff's career.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §1331 (Federal Question), and supplemental jurisdiction over the remaining claims.

4.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(l) and (2) because at least one of the Defendants resides or transacts business in the Southern District of New York and Defendants reside in New York, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

5.     Plaintiff is Dr. Giurca, who at the time of his resignation from Montefiore was Board certified in Psychiatry and Neurology.

6.     Dr. Jeffrey Weiss is Vice President of Medical Affairs at Montefiore.

7.     Dr. Claus von Schorn is the Director of Psychiatry Service at Montefiore Mount Vernon.

8.     Dr. Gary Ishkanian is the Medical Director at Montefiore Mount Vernon.

9.     Defendant Montefiore Health System, Inc. is a group of hospitals. Plaintiff worked at Montefiore New Rochelle and Montefiore Mount Vernon.

## THE LAW

**A.     The Federal False Claims Act Relief from Retaliatory Actions.**

10.     Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

11.     Relief shall include reinstatement with the same seniority status that employee, contractor, or agency would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

31 U.S.C. § 3730(h).

**B.     The New York State False Claims Act Protection from Retaliation**

12.     Any current or former employee, contractor, or agent of any private or public employer who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or penalized by an employer, or a prospective employer, because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action brought under this article or other efforts to stop one or more violations of this article, shall be entitled to all relief necessary to make the employee, contractor or agent whole.  Such relief shall include but not be limited to:

(a) An injunction to restrain continued discrimination;
(b) Hiring, contracting or reinstatement to the position such person would have had but for the discrimination or to an equivalent position;
(c) Reinstatement of full fringe benefits and seniority rights;

3

(d) Payment of two times back pay, plus interest; and

(e) Compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

**C.    New York Labor Law § 741**

13.    New York Labor Law provides that "no employer ['who provides health care services in a facility'] shall take retaliatory action against any employee who does any of the following:"

(a) Discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or

(b) Objects to or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

## FACTS

14.    Dr. Giurca raised many concerns at Montefiore, which rise to the level of violations of the Federal and New York State False Claims Acts.  Dr. Giurca's reviews are "excellent" in every category of core competency. Dr. Giurca has at least 20 positive peer evaluations—one stating that "Dr. Giurca is a consummate professional."  These peer reviewers include, but are not limited to: Dale Runcie, MD, Jason Z. D'Amore, M.D, Director Montefiore Mount Vernon, William Greenhut, MD at Montefiore New Rochelle Emergency Dept., David M. Itery (sp?), M.D., ER attending at Montefiore New Rochelle, Remus L. Moucha, M.D., attending at Emergency Dept Montefiore, New Rochelle, Sharelle (sp?) Brown, R.N., ER Nurse, Francisco (sp?) Tellus, M.D. ER Physician at Montefiore Mount Vernon, W.J. Kaniefski, M.D., Emergency Dept. Montefiore Mount Vernon, Edward Lathan, M.D., Emergency Attending at Montefiore Mount Vernon, Camille Shako, R.N. at Montefiore Mount Vernon ER., Ligisa Rocivnas, M.D. Emergency, ED and phone and video consulting, Enrique Teuscher, M.D. attending Psychiatrist at Montefiore New Rochelle and Mount Vernon and consultation liaison in

4

the Emergency Room.  All these professional peers rated Dr. Giurca as excellent—the highest possible rating, and have no negative comments whatsoever.

15.     Beginning on March 30, 2014, Dr. Giurca began bringing to light to Defendants violations such as patient abuse and Medicaid/Medicare billing fraud.  In response, Defendant Dr. von Schorn, the Director of the Behavioral Health Department, orchestrated, with the aid and abetting of Defendants Drs. Jeffrey Weiss, and Gary Ishkanian, a coordinated campaign of intimidation, coercion, and retaliation intended to silence Dr. Giurca, ultimately ending with black-listing and termination of privileges after Dr. Giurca was compelled to resign.

16.     Defendants knowingly engaged in the practice of plagiarizing Dr. Giurca, whose thorough and comprehensive psychiatric consultations allowed other attending and moonlighting physicians to up-code to 90792 (full evaluation) their claims for consultation/evaluation reimbursements when they were not as thorough and comprehensive as Dr. Giurca.  Drs. von Schorn, Perlmutter, and Hussain each plagiarized Dr. Giurca's consultation/evaluation records.

17.     Dr. Giurca provided written notification to Montefiore that Defendants' actions, of which he complained, constituted fraud and a violation of the Federal and States False Claims Act.  Indeed, on August 19, 2016, Dr. Giurca specifically alerted Montefiore manager T. Forget that on August 6, 2016, Dr. Hernandez at Mount Vernon hospital after seeing patient REDACTED wrote a superficial note missing the 5 axis diagnoses which is required by every insurance company for every psychiatric consultation.  Dr. Nager's and Dr. Hernandez's notes did not meet the requirement of code 90792.  Similarly, on August 19, 2016, Dr. Giurca alerted Senior Director of Human Resources Theresa Forget that moonlighting Dr. Chen did an extremely superficial medical note on patient          on July 8, 2016.

REDACTED

5

18.     On February 3, 2016, Dr. Giurca was called to see patient         about giving
REDACTED
the patient IV antidepressants.  At the time the patient was in the ICU, comatose, intubated,
family members had signed a DNR and a priest was administering last rights.  Any claim for
reimbursement through Medicare for iv antidepressants would have been a fraudulent claim.  Dr.
Giurca declined to administer IV antidepressants, which would have been a gross and outrageous
deviation from the standard of care.

19.     Instead for correcting the systemic problem of making comprehensive notes that
would support the level of billing, Dr. von Shorn and others plagiarized Dr. Giurca's notes.
Ironically when Dr. Giurca complained of this, Dr. Giurca was put under observation on August
1, 2016, and given a false and fabricated FPPE stating that his medical notes were not
comprehensive.  Despite repeated requests, Dr. Giurca was never provided his medical notes that
were allegedly not sufficiently comprehensive.  These allegations against Dr. Giurca were done
to discredit the complaints he made about other physicians failing to record medical notes that
would support the reimbursement sought from insurers, including Medicaid and Medicare.
Around October 28, 2016, Dr. Giurca reviewed his personnel file and requested as is
Montefiore's policy, to attach his written responses to the FPPE.  Despite his multiple requests
no substantiation of the false allegations have been produced to him or submitted to his
personnel file—because they are pure fabrications.

20.     Dr. von Shorn, finally recognizing the validity of Dr. Giurca's complaints, and
probably to cover his incompetence in rectifying all of Dr. Giurca's complaints, which are
recorded on e-mail and audio recordings, on August 12, 2016, wrote an e-mail to the psychiatric
staff titled "Just a few reminders again."  Noting each of the complaints that Dr. Giurca raised
over and over again over the past six months—without attribution to Dr. Giurca.  These

"reminders" included: "Be sure to respond to calls and pages," because some psychiatric "consults were not done." "Be sure to sign in and out," because "some of you are not doing this." "Please make sure you take extra care in completing your documentations. Consults and Initial Psych evals must have detailed information including the 5 Axis diagnosis." In addressing the plagiarizing of medical notes, Dr. von Schorn wrote, "Make sure you carefully document if you cut and paste any previous history or information into your note. Please indicate where the information is from." In response to Dr. Giurca's complaint that prescriptions lapsed over the weekend, Dr. von Shorn "reminded" "[w]hen on call, you may have to renew medications for patients on the inpatient unit. This is not unusual. Medications can expire in 3 days or 7 days depending on the type [o]f medication. We need to make sure that on the week-end that the notes are getting written, [r]emember to check the list to see which patients need notes on the week-end." In response to Dr. Giurca's complaint that overnight moonlighters were failing to evaluate patients and leaving them unattended until the day-shift psychiatrists arrived, Dr. von Shorn "reminded" that "[w]hen your (sic) are on call, and you see a patient and recommend that the patient be re-evaluated in the morning. You should re-evaluate that patient before you leave. Too many patients [a]re being left in the ED for the next shift. Do not leave things for the next shift or the day shift. Please try to have a disposition for the patient and not just leave them for the next person." Dr. Giurca has multiple detailed e-mail records preceding Dr. von Schorn's self-serving "reminder" for each of the concerns Dr. Giurca raised and von Schorn then parroted in his "reminder" memo months after Dr. Giurca raised the issues.

21.     Dr. Giurca's skills for the period October 2015 to October 2016 were formally reported as follows: "Dr. Giurca is a consummate professional. He is knowledgeable, personal, polite, responsive, and receptive to feedback. He is easy to work with. . ." On the core

competencies of "Professionalism," "Medical/Clinical Knowledge," "Practice—Based Learning and Improvement," "Interpersonal and Communication Skills," "Responsibility," "Patient Care," "Interaction with Staff," and "Overall, compared with the other practitioners of the same specialty," Dr. Giurca scored "Excellent," the highest rating possible.

22.     On Sunday, March 30, 2014, Dr. Giurca reminded Dr. von Schorn about a drug-abusing patient who came to the ER several times in 5 days in February, and that Dr. Giurca did not feel comfortable discharging the patient, who he ordered be kept for observation, however, the ER team pressured Dr. Giurca to discharge her at 3:00 am. Dr. Giurca replied to Dr. von Schorn that normally he would discharge a drug user once they were sober, but the frequency with which this patient returned to the ER alerted Dr. Giurca that something more was happening with this patient and she now presented as "high risk."

23.     The reason Dr. Giurca was reminding Dr. von Shorn about the February incident of the drug-abusing patient was because on March 30, 2014, another drug abusing patient returned to the ER around midnight, only three hours after having been discharged. Dr. Giurca admonished the ER team that he should have been called in for a psychiatry consult on March 30, 2014.

24.     On August 7, 2014, Dr. Giurca brought two issues of patient safety concerns to Dr. Von Schorn. One patient presented on August 6, 2014 and assigned to Dr. Nager. The patient came to the ER after accidentally taking 7 blood pressure pills. The ER call Dr. Giurca for a psychiatry consultation; Dr. Giurca asked if poison control had been called. The nursing answered "no" with irritation. The nurse did not see the urgency because the patient normally takes significant doses of benzodiazepines. Dr. Giurca criticized the nurse because her first

concern should have been the potential death from ingestion of an overdose of blood pressure medications not benzodiazepines.

25.    On February 4, 2015 patient JS was admitted to the medical unit, who complained to von Schorn that the psych team did not start the patient on psychotropic meds.  Contrary to the complaint, on February 4 at 4:31 pm Dr. Giurca ordered 5 mg of Haldol.  Incredibly, the same day at 7:53 pm., Dr. Gao discontinued the Haldol prescription without consulting anyone on the psychiatry team, and then accused the psychiatric team of failing to prescribe psych meds.  Time stamps will show the falsity of this accusation.

26.    The second safety issue brought to Dr. Von Schorn's attention involved a patient presenting on the previous Saturday, who had relapsed on cocaine use, and presented with depression and suicide ideation.  After Dr. Giurca's consultation, he ordered an EKG.  The ER attending chastised Dr. Giurca for ordering the EKG, which showed an abnormality; that required troponins, which also came back abnormal, and the patient was required to be admitted. This attending could have allowed the patient to be discharged, with the patient dying of Myocardial Infarction outside the hospital.  The attending physician's practice was not the practice of safe medicine and he submitted a bill for dangerous and worthless medical services.

27.    Often, and as a regular practice, patients who required psychiatric consultations in the emergency room were ignored by moonlighting psychiatrists working overnight in the ER, and were thus left for Dr. Giurca to see and render the needed consultation when he arrived at work the following morning at 9:00 am.  Months later von Schorn "reminded" the psychiatric staff of this failure.  Obviously, someone was awakened by Dr. Giurca's whistleblowing and advised von Schorn to cover his tracks with a "reminder" that is a playlist of Dr. Giurca's record of raising concerns.

28.     Dr. Giurca made several complaints to the New York State Office for Mental Health, Department of Health, Justice Center for the Protection of Individuals with Disabilities concerning the following:

- Psychiatrist Dr. Walsh neglected to see a 16-year-old child, medical record REDACTED for several hours on July 6, 2016;

- Psychiatrist Dr. Scher refused to see patients in the ER, neglecting them for as much as 14 hours, which is the duration of the overnight shift.

- On July 6, 2016, two consult requests from the medical floors that were called in at 9:00 am were deliberately neglected and not seen.

- On August 18, 2016, Dr. Hussain refused to conduct a consult request from the medical floor for almost 24 hours during his shift on August 18, 2016 from at 5:00 pm. to August 19 at 1:00 pm.

- Physicians on the inpatient unit negligently manage medications for patients for weekends resulting in medication drop off on weekends.

- On a regular basis, patients are admitted involuntarily for psychiatric treatment—some for several days, without being given a copy of legal papers (Form 9.27) of their rights and contact information for the mental hygiene legal service.  Dr. Giurca warned ER Director Dr. Gigi Madore several times that legal papers for admission are important because the institution is removing patient's liberty without justification—in effect holding patients hostage—or worse trafficking in vulnerable humans who may not be able to speak for themselves, so the hospital can seek reimbursement from Medicaid for indigent patients with mental health issues.

10

- On October 14, 2015, Dr. Scher did a psychiatric consult by telephone on patient           at **REDACTED**

  3:00 at Montefiore New Rochelle, the patient was admitted for psychiatric treatment, but ER

  Director Madore did not prepare Form 9.27, as required, and Dr. Giurca informed Dr. von

  Schorn of this.

- On November 16, 2015, Dr. Giurca reported that a patient was being held in the ER of

  Montefiore New Rochelle for psychiatric issues for three days without having had a form

  9.27 prepared and given to the patient.

29.       On November 27, 2015, Dr. Giurca reported that he was called for a psychiatric

consult on patient **REDACTED** at Montefiore New Rochelle. The patient had a high blood alcohol

reading, and was brought to the ER after falling and hitting her head. Dr. Ihezie pushed to have

the patient discharged while the patient was still drunk. In another incident involving a highly

intoxicated patient, ER Director Madore sought to discharge a patient with blood alcohol of 388

mg/dl—5 times the legal limit, and positive for marijuana. Madore harassed Dr. Giurca and

claimed that he had no medical reason for keeping the patient in the ER. Madore later falsely put

a fraudulent allegation against Dr. Giurca in the patient's medical record as retaliation against

him for calling her out on her mistreatment of this patient.

30.       One horrific failing of the admitting psychiatrists at Montefiore is the systemic

failure of psychiatrists to complete the legal paperwork required to involuntary admit a

psychiatric patient, thus depriving that patient to seek the available legal assistance to challenge

the deprivation of his or her liberty for as long as 60 days. When a psychiatric patient is

admitted involuntarily, as is often the case, section 9.27 of the New York Mental Hygiene Law

requires a certification by two examining physicians, who must separately certify—within 10

days prior to the date of the patient's admission to the hospital. The certifications also require an

accompanying application for admission of such person filed by a person who resides with the patient, a relative, or other authorized governmental or community official.  If involuntarily admitted, that patient may be held and kept in a psychiatric center for up to 60 days.  The application and certifications are designed to notify the patient or relative or friend to contact the Mental Hygiene Legal Service, who at their request may apply for a court hearing on whether the patient is a danger and must be held against their will.  Upon information and belief, and from personal observation, Dr. Giurca has only seen the complete legal papers required by mental hygiene law properly completed on one or two days from the time he started in 2014 up to July 20, 2016, when he made one of multiple reports of patient abuse and fraudulent billing for holding individuals in a psychiatric ward against their will absent due process.  Attached hereto as Exhibit A is a copy of the form Application For Involuntary Admission on Medical Certification and Office of Mental Health Rights of Inpatients in New York State Office of Mental Health Psychiatric Center.  It is utterly undeniable, that the unlawful imprisonment of mental health patients against their will, without the information that would accord them due process is a legitimate threat to public health.

   31. On May 20, 2016, Dr. Giurca reported that required legal papers were not properly completed, *i.e.*, form 9.27, by Dr. Hong for patient      **REDACTED** .  Dr. Giurca redid the form so facilities would accept the patient as a transfer.

   32. On March 21, 2016, Dr. Giurca reported to Drs. von Schorn, Barone, and Ishkanian that two psychiatric patients ( **REDACTED** and **REDACTED** ) were seen and admitted to Montefiore New Rochelle on weekends and their files were still missing forms 9.27 on the following Monday.

33.     On May 10, 2016, Dr. Giurca reported to Dr. Ishkanian that patient REDACTED needed a psychiatric admission, but form 9.27 was not completed.  Dr. Giurca repeatedly warned his supervisors at Montefiore that such failure to ensure that a patient's freedom cannot be removed without documenting the psychiatric admission properly.

34.     On May 31, 2016, Dr. Giurca reported that Montefiore New Rochelle patient REDACTED had been in the ER for several days, that an admission is needed, and no form 9.27 legal papers were completed.

35.     On July 6, 2016 at 6:05 pm, Dr. Giurca reported that a 16-year-old-child patient waited on that day since 8:00 am to have a psychiatric consult.  Dr. Scher did not fill out any legal paper work, nor leave instructions for staff.  Further Dr. Walsh simply refused to see the patient when he was called by the ER attending.

36.     On June 20, 2016, Dr. Giurca reported that Montefiore patient REDACTED did not have legal papers completely filled out.  Dr. Giurca spoke with the nurse supervisor and completed the necessary form.

37.     On July 20, 2016, Dr. Giurca reported to Dr. von Schorn and others at Montefiore that while von Schorn had met with Dr. Madore about this very issue, the next day Dr. Madore admitted an individual as a psychiatric inpatient without completing the form 9.27.

38.     On July 23, 2016, Dr. Giurca again reported to Dr. Von Schorn that on July 6 and 20, 2016, Dr. Scher did not complete required for 9.27 before admitting psychiatric patients.

39.     In a meeting on July 22, 2016, Dr. von Schorn told Dr. Giurca that is "not fair" to accuse others of failures of core competence.  Dr. Giurca disagreed stating he has the evidence and that the American Board of Psychiatry and Neurology would also disagree.  Instead of addressing the issues that Dr. Giurca brought to von Schorn's attention—with evidence—von

13

Schorn suggested that if Dr. Giurca did not like Montefiore's procedures, Dr. Giurca could leave. Dr. Giurca reminded von Schorn that the Montefiore bylaws prohibit any reprisals against someone who raises legitimate issues.

40. On July 27, 2016, shortly after arriving at work, Dr. Giurca discovered that Dr. Scher left 3 Montefiore New Rochelle patients in the ER, REDACTED, REDACTED, and REDACTED for as long as 16 hours, and although, Dr. Scher was called, he did not bother seeing the patients.

41. On July 28, 2016, Montefiore manager Jaccel Kouns informed Dr. Giurca that "We are currently investigating your complaints." Shortly thereafter, as soon as three days later, Dr. Giurca was issued an FPPE and accused of multiple failings—the very failings he brought to von Schorn's and other attention at Montefiore.

42. Dr. Giurca also reported to Ms. Kouns that the failures of the psychiatric team were causing him such stress—including the fact that he was cleaning up others' mistakes and seeing patients' other physicians had dropped on him—that he was suffering severe hypertension.

43. On August 1, 2016, after Dr. Giurca had worked for 57 hours continuously from Saturday at 8:00 am until Monday August 1, at 5 pm., without a rest, Dr. Giurca was called to a meeting with Drs. Ishkanian and von Schorn, who knew Dr. Giurca had worked an extraordinarily long shift and was exhausted, to give Dr. Giurca an FPPE, which von Schorn read aloud in front of Dr. Ishkanian, further embarrassing Dr. Giurca with false accusations in front of a fellow physician. Being a psychiatrist, von Schorn knew or should have known that Dr. Giurca's exhaustion, high blood pressure, and being confronted with multiple false accusations would be devastating to Dr. Giurca—particularly when he was being accused of the very failings by others that he had been bringing to Montefiore's attention. It was a timed and calculated

malicious act done solely to harm, discredit, and malign Dr. Giurca personally and in his career and to discredit all of the whistleblowing Dr. Giurca had done.  Any decent human being under the circumstances would have allowed Dr. Giurca to go home and rest after 57 hours of work, but no, von Schorn caught Dr. Giurca at a vulnerable moment.  There was no reason for this meeting and the issuance of the FPPE, even if the allegations were true, and they are not, to occur at that point.  Any decent person would have waited until Dr. Giurca was rested and had the meeting the next day.  As a psychiatrist, von Schorn knew how and when to maximize the impact of being confronted in front of a colleague, while exhausted with two pages of utterly false allegations—in fact, confronted and accused of the very issues and failures Dr. Giurca tried to cure in his colleagues.  Given von Schorn's training as a psychiatrist and knowing the fragile circumstances of being exhausted and with high blood pressure, von Schorn's acts can be defined as nothing other than intentional psychological abuse of a fellow physician who conscientiously tried to improve poor and illegal practices.   Dr. Giurca took days to recover from the acute distress and hypertension, and still remains personally and professionally damaged.

44.     In the FPPE, Dr. Giurca was falsely and maliciously accused of deficiencies in "clinical performance, professionalism, and communication."  The FPPE made the following false accusations, which are the very complaints Dr. Giurca raised about other staff, in an obvious attempt not only to retaliate against, but to discredit Dr. Giurca's legitimate concerns that he raised for the preceding months.  The following false accusations were made, each of which were soundly refuted by Dr. Giurca: "A1-"clinical documentation is often inadequate."  In response Dr. Giurca said, von Schorn and others have plagiarized Dr. Giurca's notes by copying and pasting them to their records.  Dr. Giurca reminded von Schorn that von Schorn commented

that Dr. Giurca's note format is the most comprehensive in the department and that von Schorn borrowed Dr. Giurca's acronym expansion and used it. Moreover, von Schorn gave new moonlighters Dr. Giurca's notes as examples of what a proper note should be. "A-2 have told staff not to call you for things you believe they should cover in weekly rounds" Dr. Giurca responded and the American Board of Psychiatry and Neurology agrees, that psychiatric consults are not appropriate for delirium and drug intoxication. "A2.2- have refused to renew medications when on call." This is the very complaint Dr. Giurca made against some of his colleagues multiple times. Citing the American Board of Psychiatry and Neurology, the inpatient doctor treating the patient is to assure the proper management of all medications at all times, especially those that expire in 3 days. Contrary to the allegation, Dr. Giurca was required to renew prescriptions that ran out on weekends. "A2.3 expectation that transfers are appropriate" In response Dr. Giurca asked to see the specific cases referred to and what the failure was. No specifics were ever provided to him., however, Dr. Giurca did specifically report that Dr. Scher had failed in a specific case of a transfer failure with patient<sub>REDACTED</sub> Again, this is an instance of falsely discrediting Dr. Giurca's concern about others' failures. "A2.4 continued reports of poor satisfaction from those to whom you deliver consultation." Dr. Giurca requested to see the proof consisting of the name, date, time, patient, med[ical] Rec[ord] number and the issue." Since January 2016, Dr. Giurca has not been given one documented and substantiated complaint against him. "A2.5 complaints about you at Schaeffer Extended Care Center . . . quality of care, availability, productivity." Dr. Giurca responded that the director of the nursing home Dr. Stivala has only said positive things about Dr. Giurca. What Dr. Stivala complained about was Dr. von Schorn and the administration, which provided only a half time physician to the facility. In fact, Dr. Stivala hired a full-time physician, not because Dr. Giurca

was not doing his job, but because the work load was impossible on a half time schedule. The false allegations go on and on, and each is refuted by Dr. Giurca. In response overall, Dr. Giurca expressed disappointment that von Schorn took time to draft a malicious and fraudulent attack instead of remedying the issues Dr. Giurca brought to light. Dr. Giurca could only conclude that the FPPE was reprisal resulting from his complaints with von Schorn and others.

45.     The next day on August 2, 2016, Dr. Giurca reported that the false allegations were so upsetting that he could not sleep, his hypertension could not be controlled, despite taking multiple blood pressure bills. Although sick, Dr. Giurca worked on August 2, 2016, but had to take sick leave in the afternoon, but saw all his patients at Montefiore New Rochelle and left instructions with Jenifer LNU about 2 patients on the unit. On August 3, 2016, Dr. Giurca was again too sick with stress and had to take a sick day. On August 3, 2016, Dr. Giurca reported the abuse he received from Dr. von Schorn to Montefiore management and that it was affecting his blood pressure and overall health. On August 4, 2016, Dr. Giurca was so concerned about his blood pressure and stroke risk that he made an appointment with his physician, and could not work. According to the advice of his physician, Dr. Giurca remained out sick on August 4, 2016. At this point, the stress was taking a physical and mental toll on Dr. Giurca that was becoming intolerable. Ultimately, Dr. Giurca was forced to resign to avoid dying from complications of high blood pressure—either stroke or heart attack, which are attributable directly to the actions of von Schorn and Montefiore.

46.     On August 5, 2016, Dr. Giurca wrote to Montefiore management including von Schorn to ask for evidence of the accusations against him and to further refute the allegations. Dr. Giurca then took vacation days from August 8 through 12 to try to reduce work-related stress.

47.     Without notice, contrary to Montefiore bylaws, on August 12, 2016, Dr. Giurca discovered that his electronic access to medical records and e-mail had been disabled.  This loss of access was intended to disrupt Dr. Giurca's ability to discover plagiarism and fraud by Dr. von Schorn and others.

48.     One unfounded accusation against Dr. Giurca is that he left early on several occasions, *i.e.*, before 5:00.  Dr. Giurca has text message proof that this allegation is false.

49.     On August 4, 2016, Dr. Giurca reported that Dr. Von Schorn plagiarized Dr. Giurca's clinical notes and accused Dr. Von Schorn of fraud for the false information in the plagiarized note.  After this report, Dr. Von Schorn accused Dr. Giurca of having "clinical documentation that is often inadequate."  In retaliation, Von Schorn put Dr. Giurca on a probation plan based on fraudulent charges.  On August 24, 2016, Dr. Weiss told Dr. Giurca that his employment was "not sustainable."

50.     On August 24, 2016, after Dr. Giurca filed his e-mailed complaints, Human Resources informed him that Dr. Weiss wanted to meet with Dr. Giurca.  At that meeting, Dr. Giurca saw the stack of e-mails with his complaints on Weiss's desk.  Dr. Jeffrey Weiss belittled Dr. Giurca's complaints and threatened termination of his employment if he continued to complain to authorities or supervisors.  Ultimately Weiss terminated Dr. Giurca's moonlighting privileges under the pretext that Dr. Giurca did not show that he had malpractice insurance, which is normally provided by Montefiore to all moonlighters.

51.     Several doctors copied Dr. Giurca's medical notes and based on such plagiarized notes up coded their claims for reimbursement from Medicaid and Medicare.  In connection with the treatment and claims for reimbursement psychiatric emergency room patients, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or

approval; knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; and conspired to commit the above acts, all in violation of 31 U.S.C. §§ 3729(a)(l)(A), (B), & (C) and N.Y. Fin. L. § 189 *et seq.*

52.     On September 6, 2016, Dr. Giurca reported that several Montefiore psychiatrists' notes as superficial and would not meet the criteria for billing code 90792, which requires a comprehensive consultation/examination.

53.     On Saturday May 7, 2016 Dr. Giurca reported that the nursing staff needed renewed medication orders for 9 patients of Dr. Walsh and Dr. Perlmutter, which Dr. Giurca fixed (   REDACTED ,  REDACTED ,  REDACTED ,  REDACTED ,  REDACTED ,  REDACTED ,  REDACTED  and   ). On September 11, 2016, Dr. Giurca reported multiple instances of physicians, Drs. Walsh, Hussain and Von Schorn, failing to renew medications, which prescriptions ended on weekends. Accordingly, Dr. Giurca was called on to renew the orders that would have ended prior to Dr. Giurca's weekend call.

54.     Specifically, Dr. Giurca alerted the institution to doctors who plagiarized Plaintiff's medical notes in order to up code the medical encounter and claim higher reimbursement.  Both Drs. Hussain and Von Schorn plagiarized Plaintiff's medical notes. Specifically, in August 2016, Dr. Hussain copied a note for a 42-year-old-female patient from the same patient's note written by Dr. Giurca in February 2016 when she was 41-years-old.

55.     After Plaintiff complained of the plagiarism, Montefiore disabled Plaintiff's remote computer access to prevent him from obtaining more proof of plagiarism

**Retaliatory Actions**

56.     On or about October 18, 2016, Montefiore orchestrated three more false complaints against Dr. Giurca: that Dr. Giurca refused to see a patient, which was a false

accusation by a doctor Moorjani, who was not present. Dr. Giurca completely refuted the accusation. In another allegation Dr. Madore fraudulently accused Dr. Giurca of fraud in the medical record of refusing to see a patient. Dr. Giurca completely refuted that allegation with his time records of the events. The third complaint was by a doctor Jesmajian who does not interact with Dr. Giurca. These complaints were more orchestrated attempts to retaliate against Dr. Giurca. Indeed, Dr. Giurca, despite his request, has never seen any substantiation for these or the allegations leveled against him on August 1, 2016.

57.     After Dr. Giurca expressed his concerns, Montefiore, aided and abetted by the individual Defendants commenced an organized and coordinated, and ever escalating campaign of retaliatory actions.

58.     As a result of the hostile reactions to reporting his concerns, Dr. Giurca suffered increased high blood pressure requiring leave from work the week of April 25, 2016, and other points in time, and a five-fold increase in anti-hypertensive medication.

59.     Dr. Giurca was working at two Montefiore facilities—New Rochelle and Mount Vernon, and thus working two positions and was overloaded with patients who other moonlighting psychiatrists left for Dr. Giurca to see, rather than doing the psychiatric consult themselves. When Dr. Giurca tried to address this issue with Dr. Von Schorn, he cursed at Dr. Giurca using foul and belittling language.

60.     Immediately after he raised these concerns he was subjected to disparate treatment, marginalized, stymied in his attempts to moonlight, made a scape goat, harassed and ultimately subjected to probation and termination of privileges without due process.

61.     On January 31, 2017, Dr. Giurca wrote to Dr. Ishkanian informing him that Dr. Weiss gave orders to Dr. Von Schorn to not give Dr. Giurca any more moonlighting calls. On

January 30, 2017, Dr. Giurca spoke to Dr. Von Schorn about receiving a new identification card. Dr. Von Schorn told Dr. Giurca that he will never put him on the call schedule, and he will not receive a new identification card.

62.    Since alerting the institution to these issues he became the victim of a campaign of intimidation, coercion, and retaliatory action that directly affects his promotion and career and professional prospects.

63.    The escalation of retaliation against Dr. Giurca made clear that there was a retaliatory consequence to speaking out about patient mistreatment, treatment deficiencies, upcoding, and complaining about his own retaliatory treatment.

64.    On September 10, 2015, after bringing a legitimate grievance to Dr. Von Schorn's attention, he dismissed the grievance, and in front of co-worker Dr. Hussain swore at Dr. Giurca insulted him and demeaned his reputation.  This matter was brought to the Dr. Ishkanian chief of the department of medicine, but the complaint was disregarded.

65.    Montefiore maintains a policy ostensibly to prohibit the violations Dr. Giurca witnessed and reported but also against retaliatory actions against him for his complaints.  The policy provides that "disruptive or inappropriate conduct which could potentially have an adverse impact on patient care will not be tolerated."  Ostensibly, Montefiore "has 'zero tolerance' for disruptive/inappropriate conduct."  Further, "[d]erogatory comments about the quality of care in the Medical Center or attacking particular physicians, nurses or any other caregiver" will not be tolerated, nor will "[e]ngaging in the abusive exercise of legitimate authority."  The policy further provides that "Montefiore will severely discipline any person who engages in retaliation."

66.     After Plaintiff filed legitimate complaints about staff who compromised patient care and safety, specifically that a moonlighter Dr. Ralph Nager refused to see a patient for 14 hours claiming falsely that no translation services were available.  On October 17, 2016, Dr. Giurca recorded Dr. von Schorn downplaying the complaint by saying "crap happens . . . what am I supposed to tell Nager to do, learn Spanish?"

67.     Some time after the complaint about Dr. Nager, Dr. Giurca sent Dr. Jeffrey Weiss an audio recording in which Dr. von Schorn stated "crap happens . . . what am I supposed to tell Nager to do, learn Spanish?" as a result, Dr. Weiss violated Montefiore's policy and issued an order to prevent Plaintiff from moonlighting and have him blacklisted, which was a direct attack on Plaintiff.  Before Dr. Giurca sent the audio recording, Weiss threatened Plaintiff in person on August 24, 2016, by stating that Plaintiff's "employment is not sustainable."  After August 25, 2016, Dr. Giurca also sent complaints to the New York State Office of Mental Health, the Department of Health, and the Justice Center for the Protection of Individuals with Disabilities.

68.     After being compelled to resign under the continuing attacks, when he turned in his identification card on January 9, 2017, Dr. Giurca recorded Dr. Von Schorn, Dr. Von Schorn told Plaintiff "you've annoyed Dr. Weiss," "he's not too happy with the situation."  In following through on their threats—Plaintiff was denied any moonlighting calls since January 2017, his access to the electronic medical record was denied, and he was refused the issuance of an identification badge—even though he was told that he still had privileges at the hospital.  When Plaintiff asked Dr. Von Schorn who gave these orders, Von Schorn stated "the whole big administration."

69.     Dr. Giurca has audio of informing Dr. von Schorn of Dr. Nager refusing to see a patient for 14 hours.  Dr. von Schorn stated "crap happens . . . what am I supposed to tell Nager

to do, learn Spanish?" The audio is undisputable evidence of a threat to the health of a specific patient. The patient Nager had refused to see had auditory hallucinations telling him to kill himself—Nager could have administered medication to stop the hallucinations, but he did nothing—risking the life of this patient. Dr. Giurca sent the audio to Drs Steven Safyer (president of Montefiore), Jeffrey Weiss, and Claus von Schorn, and as a result was placed on the blacklist as additional retaliation, separate from denial of moonlighting privileges.

70.     Despite submitting audio recordings of these interactions with Dr. Von Schorn and a complaint that he was suffering retaliation, Theresa Forget, the Director of Human Resources issued a letter to Plaintiff on March 28, 2017 stating "a review has been conducted regarding your concerns [the alleged lack of a translator causing a 14-hour delay of treatment, and of retaliation for making the complaint] and we have found that they are not substantiated." Accordingly, Forget covered up the treatment failure as well as the retaliation suffered by Plaintiff.

71.     On March 30, 2017, Dr. Weiss, Vice President for Medical Affairs, issued a letter to Plaintiff "Suspension Notification Urgent—Immediate Response Requested." In the letter, he cites a pretextual reason for the suspension stating: "This letter is to inform you that, as the result of your inability to provide satisfactory professional liability insurance coverage, your privileges at Montefiore Mount Vernon and/or your appointments to the Medical Staff are hereby resigned, effective immediately. You may not admit, treat[,] or provide consultation for patients at any Montefiore Health System locations." Montefiore had at all times provided Dr. Giurca with malpractice insurance. Indeed, all moonlighting doctors are provided malpractice insurance by the hospital. Accordingly, the claim that his privileges at Montefiore were pulled because he was allegedly unable to provide his own professional liability coverage was pretextual.

Moreover, Dr. Giurca was denied privileges at Montefiore without justifiable reason, and in retaliation for his whistleblowing activities. On or about January 29, 2017, Dr. Giurca learned that von Schorn put out orders to prevent Dr. Giurca from moonlighting at Montefiore Mount Vernon because Dr. Giurca filed complaints about violations that put patients' life in danger.

72.     On or about January 6, 2017, Dr. Giurca commenced employment with Greater Hudson Valley Health Services ("GHVHS") at Orange Regional Medical Center ("ORMC") by entering a binding employment Contract for 3 years and compensation of $260,000 per year not including bonuses. When Dr. Giurca started work at ORMC, Dr. Galarneau stated "You don't know how happy I am that you started on C[onsultation] L[iason] psychiatry." This full-time position involved clinical work, academic work, research, and directing the consultation liaison services of the Psychiatric Department. Attached hereto as Exhibit B is a copy of the Contract between GHVHS Medical Group, P.C. and Dr. Giurca.

73.     Montefiore maintains a "blacklist" of individuals who are barred from its institutions. On September 26, 2018, Dr. Rojas the Director of Psychiatry at Orange Regional Medical Center told Dr. Giurca that he had seen Dr. Giurca's photograph on the wall of the Montefiore Wakefield hospital security office with other individuals' photographs who were deemed a "security risk." Dr. Giurca has done nothing to warrant being blacklisted or to have his photograph posted as a security risk. Dr. Giurca has never worked at Montefiore Wakefield—only Montefiore Mount Vernon and New Rochelle. Dr. Rojas then asked Dr. Giurca what he had done to be exposed on a blacklist. Dr. Giurca replied in an email dated September 27, 2018, that he reported fraudulent practices at Montefiore, D. Jeffrey Weiss retaliated by saying "your employment is not sustainable" and putting Dr. Giurca's photo on the blacklist. Posting Dr. Giurca's picture among individuals deemed "security risks," in the

Wakefield Hospital security office is publication likely to be viewed by physicians, like Dr. Rojas, who was applying for a moonlighting position and was sent to the security office to have his own identification photograph taken. Similarly, any medical staff needing a security photograph would see Dr. Giurca's photograph as a deemed "security risk." It was impossible for Dr. Giurca to know more about when, by whom, and other details about the photographs position because by virtue of the posting he was barred from the facility as a "security risk."

74.     Dr. Giurca was also informed in February 2018 of his name and photo on the blacklist by a high-level employee at Montefiore New Rochelle, who wishes to remain anonymous for fear of reprisal.

75.     Dr. Giurca was confronted on September 26, 2018, by his supervisor Dr. Rojas, at his subsequent employer that circa February 2018 his picture was posted on a blacklist at Montefiore Wakefield. Dr. Rojas happened to be in the security office of Wakefield because he was seeking employment there and was having his own photograph taken for his identification. Shortly after being confronted with this information by his supervisor Dr. Giurca was terminated without cause from his employer Orange Regional Medical Center ("ORMC"). Dr. Giurca has a contract of employment to work at ORMC, which by virtue of his photograph broadcast as a security risk, it cost him his employment at ORMC. Dr. Giurca has irreparable harm resulting from the smear campaign and in particular the photo display labeling him a security risk. Dr. Giurca knows that Dr Rojas told others at ORMC about the photo and security risk. As a result of learning this information, Dr. Vieux at ORMC asked for a security escort to his car. There are enormous personal, familial, professional and social repercussions from defendants' behavior that will continue as professionals talk about the photograph posted of Dr. Giurca as a "security risk." That image can not be scrubbed from the minds of all who saw it.

76.     According to the Merck Manual and other medical resources, hypertension and stress are significant risk factors for stroke.  Hostility, false accusations, and defamation have caused Dr. Giurca to suffer sever high blood pressure, and made him physically sick with headaches and dizziness.  This risk of stroke or heart attack from his abnormally high blood pressure is a distinct danger and concern separate from the emotional distress he suffers.  Dr. Giurca warned Montefiore management including von Schorn several times that dealing with the incompetence of his fellow physicians, the hostility, and retaliation were toxic for him.  Dr. Giurca feared for his patients, and Dr. Giurca feared he may die of a stroke from high blood pressure.

## FIRST CLAIM
### Violations of the Federal False Claims Act
### (31 U.S.C. § 3730(h))
### Retaliation as Against Montefiore

77.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

78.     Defendant Montefiore violated Section § 3730(h) of the False Claims Act, 31 U.S.C. § 3730(h).

79.     Defendant Montefiore has intentionally retaliated against Plaintiff by marginalizing him and placing him on probation without valid reason, by defaming him, by harming his professional development and business opportunities, and by denying him moonlighting opportunities.

80.     Such conduct by Defendant was due to actions Plaintiff has taken in furtherance of his efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendant had actual and constructive knowledge of such actions.

26

81.     Such conduct by Defendant has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## SECOND CLAIM
### Violations of the State False Claims Act
### (N.Y. Fin. Law § 191)
### As Against Defendant Montefiore

82.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

83.     Defendant violated Section 191 of the New York False Claims Act § 191.

84.     Defendant has intentionally retaliated against Plaintiff by marginalizing him and placing him on probation without valid reason, by defaming him, by harming his past present and future business and professional and academic development.

85.     Such conduct by Defendant was due to Plaintiff's actions taken in furtherance of his efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

86.     Such conduct by Defendant has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## THIRD CLAIM
### New York Labor Law § 741
### As Against Montefiore

87.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

88.     Defendant violated Section 741 of the New York Labor Law.

89.     Defendant has intentionally retaliated against Plaintiff by marginalizing him and placing him on probation without valid reason, by defaming him, by harming his past present and future business and professional and business development because he brought to light multiple instances of patient harm, abuse and mistreatment.

90.     Such conduct by Defendant was due to Plaintiff's actions taken in furtherance of his efforts to stop patient harm and abuse and Defendant had actual and constructive knowledge of such actions.

91.     Such conduct by Defendant has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

### FOURTH CLAIM
### Injunctive Relief
### Against Montefiore

92.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

93.     Defendant intended and did inflict harm to Plaintiff, by posting a photograph of him in at least one of its satellite facilities Wakefield Hospital in its security office, where members of the public enter.  Plaintiff's photo hangs among individuals who are deemed "security risks," which resulted in special irreparable damages, including but not limited to the loss of reputational standing, professional status, employment, business contracts and business opportunities.

94.     Such conduct by Defendant has damaged Plaintiff irreparably and all such photographs of Dr. Giurca must be removed.

28

## FIFTH CLAIM
### Defamation
### As against all Defendants

95.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

96.     Defendants defamed Plaintiff per se both by slander and libel.

97.     Defendants made false statements about Plaintiff that identified him, both orally and in writing, and the statements and photographs were publicized.

98.     Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## SIXTH CLAIM
### Intentional Infliction of Emotional Distress
### As against all Defendants

99.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

100.    Defendants' intentional and reckless, and outrageous acts of retaliation, including their defamatory statements, their attempts to threaten and intimidate him, their false reporting about him, and their attempts to harm Plaintiff's business were intended to and did in fact cause Relator severe emotional distress.

101.    Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## SEVENTH CLAIM
### Negligent Infliction of Emotional Distress
### As Against all Defendants

102.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

103. Defendants' negligent acts of retaliation, including their defamatory statements, their attempts to physically threaten and intimidate him, their false reporting to the public, and their attempts to harm Plaintiff's business and professional standing were intended to and did in fact cause Plaintiff severe emotional distress.

104. Defendants owed a special duty to Plaintiff as a whistleblower.

105. Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## EIGHTH CLAIM
### Tortious Interference with Contract
### As against all Defendants

106. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

107. Plaintiff had valid contracts with third parties, including his past employer, and with clients through that employer.

108. Defendants knew of these contracts and intentionally interfered with them, causing their abandonment.

109. Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## NINTH CLAIM
### Tortious Interference with Prospective Business Relations
### As against all Defendants

110. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

111. Plaintiff had business relations with third parties including his past employer, and with potential future parties and employers.

112.    Defendants sought to harm and did harm those relationships by acting in using dishonest, unfair means, and with an improper purpose, which caused Plaintiff damages.

113.    Defendants' conduct amounted to an independent tort, and was done for the sole purpose of inflicting intentional harm.

114.    Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

(a)    On the First, Second and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3730 (h), N.Y. Fin. L. § 191, and N.Y. Labor § 741, for double his back salary in an amount to be determined at trial, and restitution and payment of all benefits with interest.

(b)    On the First, Second and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3730 (h), N.Y. Fin. L. § 191, and N.Y. Labor Law § 741, an award of costs and attorney's fees; and

(c)    On the Fourth Claim awarding the Plaintiff injunctive relief of removing his name from all blacklists and his photograph from all defendant's facilities, including litigation costs, and reasonable attorney's fees; and

(d)    On the Fifth, Sixth, Seventh, Eighth and Ninth claims for relief an amount to be determined at trial.

(e)    Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated: New York, New York,
       April 5, 2019

|  |  | **SADOWSKI KATZ LLP** |
|---|---|---|
|  | By: | s/ Robert W. Sadowski |
|  |  | Robert W. Sadowski<br>800 Third Avenue, 28th Floor<br>New York, New York 10022<br>Telephone: (646) 503-5341<br>rsadowski@sadowskikatz.com |